[Crim. No. 1349.   Second Appellate District, Division Two.—February 23, 1927.]

## THE PEOPLE, Respondent, v. HARRY ALPINE, Appellant.

[1] CRIMINAL LAW—MURDER—SELF-DEFENSE—RELATIONS BETWEEN DEFENDANT AND DECEASED—EVIDENCE.—In a prosecution for murder, the defendant, as part of the evidence under his plea of self-defense, was entitled to ask questions designed to elicit the story of his relations with deceased and to support the theory of the defense that deceased had taken certain articles from defendant in a hold-up, that defendant had reported the occurrence to a police officer, and that deceased had repeatedly threatened to kill defendant because of the exposure.

[2] ID.—RELATIONS OF PARTIES TO HOMICIDE—EVIDENCE.—The relations of the parties to a homicide, prior to the commission thereof, may be shown for the purpose of determining their state of mind at the time of the killing, and to establish malice or motive on the part of the defendant, or to assist the jury in determining who was the aggressor in the fatal affray, or as tending to shed light upon the issue whether defendant, as a reasonable man, believed that he was in danger of losing his life or suffering great bodily harm.

[3] ID. — SELF-DEFENSE — EXCLUSION OF TESTIMONY ON DIRECT EXAMINATION — ERRORS NOT CURED ON CROSS-EXAMINATION. — In such prosecution, the errors of the trial court, committed during the direct examination of defendant, in denying him the right to testify as to his relations with deceased were not cured by the action of the prosecutor in opening up the subject on cross-examination of the defendant, where the jury was given to understand that it was not the right of defendant to tell the story of the alleged hold-up, and the story finally reached the jury under very different auspices than those which would have fostered its fall from the lips of defendant on his direct examination.

[4] ID.—COMMUNICATION OF THREATS—HEARING BY OTHERS—EVIDENCE. In such prosecution, the trial court erred in ruling that defendant was not entitled to show that certain persons heard others communicate to defendant threats which the deceased had asked the communicants to repeat to defendant.

[5] ID.—SELF-DEFENSE—THREATS—HEARSAY.—In such prosecution, in connection with the evidence that defendant shot deceased in re-

2.   See 13 R. C. L. 912; 13 Cal. Jur. 696.

5.   Admissibility in homicide case of threats by deceased against accused, notes, 1 Am. Dec. 373; 61 Am. Dec. 53. See, also, 13 R. C. L. 921; 13 Cal. Jur. 701.

pelling an assault which the latter made upon him, it was proper for defendant to show that deceased had threatened his life or to do him great bodily harm, and that the threats had been repeated to him; and corroborative evidence of the communication of the threats to defendant was not hearsay.

[6] ID.—HEARING CONVERSATION—EVIDENCE.—One need not be a party to a conversation in order to relate it. If he has heard the conversation, that is enough.

[7] ID.—CHARACTER WITNESSES—VOIR DIRE EXAMINATION.—In such prosecution, witnesses produced by defendant who testified that they knew deceased, that they knew other persons in the city where deceased lived who were acquainted with deceased, and that they knew deceased's general reputation in respect to peace and quietude, should have been permitted to answer as to the reputation of deceased in the preliminary questions addressed to them, without first being examined by the prosecutor as to the sources of their information, etc. (On denial of hearing in supreme court, approval withheld.)

[8] ID. — REPUTATION OF DECEASED — EVIDENCE.—In such prosecution, the trial court erred in sustaining the prosecution's objections to the question put to a witness for a defendant as to the deceased's general reputation, where such witness had testified that he had kept a hotel at a certain place for about six months, that he had lived in the same neighborhood most of his life, that he got acquainted with deceased while he kept the hotel and saw him "about twice" in the neighborhood, that he knew a few people who knew deceased when they saw him, and that he talked with various people in the city and in the neighborhood in which the name and general conduct and character of deceased was discussed.

[9] ID.—REPUTATION—KNOWLEDGE OF WITNESS AS TO PERSONS KNOWING DECEASED.—In such prosecution, it was error to prevent a witness for defendant who knew deceased and who had heard deceased's reputation discussed from testifying to the general reputation of deceased merely because he knew no one who knew deceased.

[10] ID.—SELF-DEFENSE—INSTRUCTION—EVIDENCE.—In such prosecution it was error, but not harmful error, to give an instruction to the effect that "self-defense is not available as a plea to one who, by prearranged duel, or by consent, has entered into a deadly mutual combat in which he slays his adversary," where there was no evidence to base such an instruction.

8. Admissibility in homicide case of evidence of character of deceased, notes, 4 Ann. Cas. 338; 8 Ann. Cas. 357; 11 Ann. Cas. 229. See, also, 13 R. C. L. 919; 13 Cal. Jur. 693.

10. Right to set up self-defense in case of homicide in mutual combat, note, L. R. A. (N. S.) 646.

[11] ID.—ARGUMENT—MISCONDUCT.—In such prosecution, the remarks of the district attorney in his argument to the effect that defendant had "skipped town" because he himself had obtained a watch in "a hold-up," constituted misconduct, and the trial court's refusal to instruct the jury to disregard such remarks was error, where there was nothing in the evidence which even remotely justified such argument.

[12] ID.—IMPEACHMENT OF WITNESSES — EVIDENCE—ARGUMENT—MISCONDUCT.—In such prosecution, the remarks of the prosecutor in which he referred to certain witnesses for the defendant as being members of the underworld, hijackers, and that it wouldn't be safe for any member of the jury to meet any one of these men in a dark alley at night, constituted misconduct, and the trial judge erred in not instructing the jury to disregard them, where they did not present a legitimate argument upon the evidence before the jury and as they constituted an impeachment of defendant's witnesses in a manner not contemplated by the law.

[13] ID.—MISCONDUCT—EVIDENCE.—In such prosecution, the prosecutor was guilty of misconduct in referring to the reason for defendant's departure from the state, and the trial judge committed error in refusing to instruct the jury to disregard the remarks, where there was no evidence to support them.

[14] ID.—MISCARRIAGE OF JUSTICE—EVIDENCE—APPEAL.—In such prosecution, the appellate court, from an examination of the entire cause, is of the opinion that the errors complained of by defendant have resulted in a miscarriage of justice.

---

(1) 30 C. J., p. 235, n. 98, p. 236, n. 11.   (2) 30 C. J., p. 237, n. 32, 33.   (3) 17 C. J., p. 335, n. 9; 40 Cyc., p. 2510, n. 29.   (4) 30 C. J., p. 238, n. 43.   (5) 16 C. J., p. 624, n. 19, p. 626, n. 77; 30 C. J., p. 237, n. 31½.   (6) 16 C. J., p. 624, n. 22.   (7) 22 C. J., p. 481, n. 6, p. 483, n. 47.   (8) 30 C. J., p. 234, n. 58.   (9) 30 C. J., p. 234, n. 59 New.   (10) 17 C. J., p. 342, n. 94.   (11) 16 C. J., p. 897, n. 93.   (12) 16 C. J., p. 916, n. 47.   (13) 16 C. J., p. 916, n. 47; 17 C. J., p. 342, n. 94.   (14) 17 C. J., p. 368, n. 5.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Sidney N. Reeve, Judge. Reversed.

The facts are stated in the opinion of the court.

Morris Abraham and Charles I. Rosin for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

---

11.  See 8 Cal. Jur. 264.

WORKS, P. J.—Defendant was convicted of murder in the first degree, and was sentenced to life imprisonment, under recommendation of the jury that tried him. He appeals from the judgment and from an order of the trial court denying his motion for a new trial.

The victim of the alleged murder was one Barney Blum. Appellant admitted the killing and defended solely on the ground that he took Blum's life in defense of his own. In order properly to consider the points made upon the appeal it becomes necessary to state in a general way the theories upon which, respectively, the prosecution and the defense were conducted in the trial court. It was the theory of the prosecution that appellant was indebted to Blum in the sum of $150, and that he had delivered a watch and chain to that individual to hold as security for the payment of the debt; that difficulties arose between the two because of this state of affairs and that appellant's killing of Blum was deliberate and premeditated.

The theory of the defense was that about three weeks before the killing Blum "held up" appellant at the muzzle of a gun and robbed him of a watch and chain and of money; that he then threatened to kill appellant if the latter reported the robbery to the police; that he also demanded that appellant bring more money to him at a certain place on the next day, whereupon he would return to appellant the watch and chain, but threatened to kill appellant if he did not bring the money; that appellant did not deliver the money as demanded, but reported the robbery to a police officer with whom he was acquainted and requested the officer to ask Blum to return the watch and chain; that the officer later asked Blum in the presence of appellant to return the articles, but that Blum said he had pawned them and promised to give to appellant, if allowed the chance to do so, the pawn ticket which he held for them, provided appellant did not proceed against him criminally; that appellant said he would give him the chance, as he didn't care for the small amount of money that had been taken from him; that the pawn ticket was not produced, that Blum told several persons that he would kill appellant as a "squawker" and "stool-pigeon," and that these threats were repeated to appellant; and that, finally, appellant shot

Blum in the midst of a vicious attack which the latter made upon him, and after Blum had struck him on the hand with a monkey-wrench, as the hand was held to protect his head, at which the blow was aimed. Blum was shot by appellant on September 2, 1925.

[1] When appellant was on the witness-stand he was asked a variety of questions designed to elicit the story of his relations with Blum from August 11, 1925, to the day of the final catastrophe, the day in August being the one, according to the theory of the defense, upon which appellant had been robbed by Blum. Objections to these questions were uniformly made by the district attorney on the grounds that they were incompetent, irrelevant, and immaterial, and in one or two instances, as assuming something not in evidence, and the objections were as uniformly sustained. The questions were, in part, as follows, after appellant had testified that he was on Brooklyn Avenue, near Cummings Street, at which point it was claimed the robbery had occurred, on August 11, 1925: "Was anyone with you at the corner of Cummings and Brooklyn avenue on the 11th day of August, this year? . . . Were you at Cummings street near Brooklyn avenue in the night time of that day? . . . Did you see that night Barney Blum at Cummings street and Brooklyn avenue? . . . When you were at [that corner] did you have a Howard gold watch? . . . A gold chain and $15 in money? . . . Did Barney Blum rob you of a gun— of a gold watch, a chain and $15 in money on the 11th of August? . . . Had you ever seen this man Blum before the 11th day of August, 1925, in the city of Los Angeles? . . . Did you make a report to a police officer of the city of Los Angeles a short time after the 11th of August, 1925, of a robbery committed by this man upon you at that point?" Here the district attorney, after interposing his objection, remarked: "I . . . am going to ask the court to warn counsel not to ask further questions in that regard. He knows perfectly well under the rules of evidence and under your Honor's rulings in this matter, that it is incompetent, it is immaterial, and he is endeavoring by his questions to get before this jury a matter indirectly, which he knows cannot be done directly." The court merely sustained the objection. These further questions were then propounded: "Do you know a police officer by the name of Ben Penosky? . . .

Did you see police officer Ben Penosky at the University Police Station or near there a short time after the 11th day of August, 1925?'' After sustaining the objections to these interrogatories the trial judge remarked: ''I have been consistent in my rulings, . . . and will continue to be consistent in my rulings along that line of questioning, so far as this witness is concerned.'' The witness was then asked: ''Did you with police officer Ben Penosky in this city go together and search for Barney Blum and did you find him in this city?'' An objection to this question was sustained. Various other questions devoted to the purpose already stated, and which it is unnecessary further to specify, were propounded to the witness. They were all ruled out.

The trial court erred in these rulings, except in one or two instances in which the objection was made that questions assumed something not in evidence. Even that objection, however, was not always good when it was made. Appellant clearly was entitled to show the matters sought to be elicited by the questions as a part of the evidence under his plea of self-defense. The prosecution contended that the watch and chain had been delivered to Blum as security for the payment of debt. It was the theory of the defense that Blum had taken the articles from appellant in a hold-up, that appellant had reported the occurrence to a police officer, and that Blum had repeatedly threatened to kill him because of the exposure. What appellant sought to prove was, therefore, a vital element in the case. [2] ''The relations of the parties to a homicide, prior to the commission thereof, may be shown for the purpose of determining their state of mind at the time of the killing, and to establish malice or motive on the part of the defendant, or to assist the jury in determining who was the aggressor in the fatal affray, or as tending to shed light upon the issue whether defendant, as a reasonable man, believed that he was in danger of losing his life or suffering great bodily harm'' (13 Cal. Jur., p. 696). For the time being, at least, the trial court effectually emasculated the only defense appellant was seeking to present to the jury.

[3] During the cross-examination of appellant, however, the district attorney went into the matters which appellant had been denied the right to produce on direct examination. The attorney-general contends that the errors of the trial

court, committed during the direct examination, were cured by the inexplicable course of the district attorney, after effectually throttling the direct examination, in opening up the subject on cross-examination. Whether this is so depends in some measure upon the attitudes of the district attorney and trial judge during the direct examination, upon the very fact that the prosecutor was allowed to produce evidence which it was the right of defense to elicit, which right had been denied, as well as upon the manner in which the cross-examination was conducted.

Toward the close of the direct examination of appellant he was allowed to testify that the police officer, Penosky, had a conversation with Blum in his presence on August 31st, although he was not permitted to state what the conversation was. One of the early questions asked on the cross-examination was this: "This man Penosky that you have reference to, is that the same Penosky who has been dismissed from the police department?" The court sustained an objection to the question on the ground that it was not a proper cross-examination, but upon a statement of the district attorney that it was asked for the purpose of identifying the officer, the question was voluntarily reframed thus: "Do you know whether or not Mr. Penosky is at the present time connected with the police department?" Over objection, the court permitted an answer, which was, merely: "I don't know." A few questions later, still referring to Penosky, the district attorney asked: "Did you ever see him in the county jail?" Appellant's counsel not only objected to this question, but asked the court to strike it out and to instruct the jury to disregard it. The court ruled adversely, however, and the witness answered: "I did not." After some further cross-examination on other matters, appellant referred, in an answer, to something as having occurred "after I was held up." The district attorney then asked a few questions which brought out answers fixing the time when the alleged hold-up happened, and showing that appellant had not reported the occurrence to the police station, or to the sheriff, or to the district attorney, but only to Penosky, a policeman with whom he was acquainted. These questions were shortly followed by this: "Q. Now, tell the jury—I presume you would like to do so—all about this hold-up." Appellant then detailed his story of the event.

In our opinion, the errors of the trial court, committed during the direct examination of appellant, were not cured by the cross-examination, although their injurious effect was perhaps minimized by it. The jury was given to understand that it was not the right of appellant to tell the story of the alleged hold-up. This was plainly shown by the remarks of the district attorney during the direct examination, when he unjustly charged counsel with an attempt, by indirection, to get forbidden matters before the jury, and by the continued rulings of the trial judge, especially as that officer felt it necessary to notify counsel that he had been consistent in his rulings and that he would continue to be so. Not only was this wrongful impression left with the jury, but the impression must also have been created upon that body, when appellant was finally permitted to tell the story of the hold-up, that the permission was granted as a matter of grace by the prosecution. Also, early in the cross-examination the trial court overruled the very proper objections to the questions as to Penosky's standing as a police officer and as to whether appellant had ever seen Penosky in jail, thus condemning in advance any evidence in which that individual might figure. And further, and finally, the prosecutor cross-examined appellant upon the hold-up story, and in some degree discredited it before it had ever been heard by the jury. From all these circumstances it manifestly appears that the story finally reached the jury under very different auspices than those which would have fostered its fall from the lips of appellant on his direct examination. He was entitled to the impression which it might have created when coming to the jury in that natural and legitimate way, shaken though it might have been upon timely and orderly cross-examination or upon the production of opposing testimony. When it finally got to the jury it doubtless possessed little of the weight which it might otherwise have been accorded by that body.

[4] One Saul Finkel testified that Blum asked him to tell appellant that "if I see him I will cut him up." Finkel said that Blum made this request the latter part of August. Finkel also testified that he conveyed Blum's message to appellant. One Isidore Goldfein testified that late in August Blum said to him, speaking of appellant, "I will kill him if I get ahold of him. I will cut him up." Goldfein

further testified that he repeated Blum's statement to appellant. Appellant sought to prove by Finkel that he heard Goldfein, and by Goldfein that he heard Finkel, make his communication to appellant. An endeavor also was made to prove by Goldfein's wife that she heard her husband make his communication. Objection was made to each of these items of corroboration on the ground that the evidence was immaterial and that it was hearsay, and the objections were sustained. Each of these rulings was error. The proffered evidence plainly was material. [5] There was evidence in the record that appellant shot Blum in repelling an assault which the latter made upon him. In connection with this evidence it was proper for appellant to show that Blum had threatened his life or to do him great bodily harm, and that the threats had been repeated to him (30 Cal. Jur. 66, 191). The corroborative evidence offered from the lips of Finkel, Goldfein, and Mrs. Goldfein was not hearsay. [6] One need not be a party to a conversation in order to relate it. If he has heard the conversation, that is enough (*People* v. *Fitzpatrick,* 78 Cal. App. 37 [247 Pac. 601]).

[7] Appellant endeavored to prove by three or four witnesses that the general reputation of Blum in Los Angeles, in which city he lived and in which he was shot by appellant, for peace, quietude, and as to his being dangerous, turbulent, and bloodthirsty, was bad. Each of the witnesses testified that he knew Blum, that he knew other persons in Los Angeles who were acquainted with that individual, and that he knew what Blum's general reputation was in the respects mentioned. In each instance the district attorney then asked and was granted by the court the right to conduct what is termed in the record a *voir dire* examination. The prosecutor then asked each witness a variety of questions as to the sources of information, etc., upon which he proposed to testify concerning Blum's reputation, and at the end of his examination the prosecutor objected that there was no sufficient foundation for the testimony as to reputation, and the objection was sustained. The attorney-general seeks to justify this unusual procedure upon the ground that one who is asked to testify to reputation is an expert witness, and that all such witnesses may be examined by opposing counsel, touching their qualifications, before

being permitted to state their opinions. There is no such
rule as to witnesses of the character now under considera-
tion, and the attorney-general cites no authority to support
his position. Each of the witnesses whose testimony was
offered by appellant to prove Blum's reputation was shown
to be qualified to answer before the question as to reputation
was put to him. The questions preliminarily addressed to
each witness were similar in form to those usually put to
witnesses who are called to impeach other witnesses on the
ground that their general reputation for truth, honesty, and
integrity is bad, under a practice which is supported by a
mass of authority. See *People* v. *Hickman,* 113 Cal. 80
[45 Pac. 175]. For a general statement of the rules affect-
ing the examination of impeaching witnesses, see, also, note
to *Allen* v. *State,* 73 Am. Dec. 771, and note to *Lodge* v.
*State,* 82 Am. St. Rep. 26, although we do not mean to say
that all the rules there stated are applicable in California.
The practice under which evidence as to reputation is re-
ceived, when the question of reputation is in issue, follows
that which applies when the attempt is made merely to im-
peach a witness because of bad reputation. The existence
of such a practice is vouched for by the attorney-general in
his brief. We think the witnesses should have been per-
mitted to answer as to the reputation of Blum in the re-
spects mentioned in the preliminary questions addressed to
them. The next step would have been for the prosecutor
to minimize or destroy, by cross-examination, the weight of
their testimony by such questions as he put to them upon
his so-called *voir dire* examination.

[8] Two other witnesses were called to testify to the
reputation of Blum. It was objected as to each of them
that he was not shown to be qualified by the questions put
to him by appellant's counsel, and the objection was sus-
tained in each instance. One of these witnesses testified that
he had kept a hotel at a certain place for about six months,
that he had lived in the same neighborhood most of his life,
that he got acquainted with Blum while he kept the hotel
and saw him "about twice" in the neighborhood, that he
knew a few people that knew Blum when they saw him, and
that he talked with "various people in the city of Los
Angeles and in the neighborhood in which the name and
general conduct and character" of Blum was discussed. The

question as to Blum's general reputation was then put to the witness. The court erred in sustaining the objection to the question.

[9] The other witness referred to in the last preceding paragraph testified that he had known Blum sixteen or seventeen years, that he first saw him in Los Angeles "three years ago," that Blum then went away and was gone for a year and a half and then returned, that he had after that known him in Los Angeles for eight months, that during that period he saw Blum "lots of times," that he was not acquainted with people who knew Blum in Los Angeles, and that he had heard discussed Blum's reputation in Los Angeles in the respects stated above. The witness was then asked if he knew Blum's general reputation in Los Angeles. Upon objection being made, the following occurred: "[A Deputy District Attorney]: He said he never knew anybody that knew Barney Blum in the city of Los Angeles. The Court: Was that your answer to the question that you never knew anybody that knew him? The Witness: Oh, no; there is a lot of people who knew him. The Court: Did you know anybody that knew him? The Witness: Yes, I knew him." The question was then read, to which the witness had already answered that he knew no one who knew Blum, when the following transpired: "[Counsel for defendant]: Did you understand that question? A. I do understand it now but I didn't understand it then. Q. You didn't understand it then? A. No, sir." The witness was then asked if he knew Blum's reputation in Los Angeles in the respects already mentioned, objection was interposed, and the objection was sustained. The ruling was error. If we grant, without deciding, that the final result of the record is that there was was no showing whether or not the witness knew anyone who knew Blum—and the record indicates no more than that—we know of no rule which forbids a witness to testify to the general reputation of an individual merely because he knows no one who knows him. It would seem that one may know the general reputation of A in a community without knowing anyone who knows A, if he knows A himself. He cannot know of his own knowledge that others are acquainted with A unless he has seen them in his presence, but he nevertheless may have heard many discuss A's reputation who actually know him.

[10] Appellant takes exception to an instruction given to the jury by the trial court, to the effect that "self-defense is not available as a plea to one who, by prearranged duel, or by consent, has entered into a deadly mutual combat in which he slays his adversary." There was no evidence upon which to base such an instruction, and it was error to give it. We think, however, that the error could not have been harmful.

[11] It is contended that a deputy district attorney who aided in the prosecution of appellant was guilty of misconduct during the trial. The alleged misconduct occurred during the final argument addressed to the jury. The record shows the following: "[A Deputy District Attorney]: 'Oh,' they say, 'Would you loan $150 on a watch and chain?' Let me ask you something. Think about this, will you? If you knew that a watch and chain had been obtained in the commission of a hold-up by a pal of yours and you knew that that man wanted to skip town and he didn't have the money to skip town and you knew that if he was here he would be caught or arrested and prosecuted for robbery, and you had the money, would you loan him $150 on a watch and chain?" Immediately upon these remarks being made to the jury appellant objected to them, whereupon the court stated that "it is a matter of argument." Appellant then assigned the remarks as misconduct and asked the court to instruct the jury to disregard them. The trial judge merely responded: "You have your assignment." The remarks were misconduct, and the court's refusal to instruct the jury as requested was error. The testimony showed that appellant had taken a trip to Vancouver, British Columbia, soon after the time when, as he testified, Blum had made him the victim of a "hold-up." There was nothing in the evidence which even remotely justified the argument made by the district attorney to the effect that appellant had "skipped town" because he himself had obtained a watch in a "hold-up." This is what is meant by the remarks of the prosecutor, a fact attested more strongly by the context than by the excerpt itself which we have taken from the argument. The lending of $150 mentioned in the prosecutor's remarks referred, of course, to the loan claimed by the prosecution to have been made by Blum to appellant.

[12]   During his address to the jury the counsel for appellant, Mr. Allender, referred, for the purposes of illustration, comparison, and argument, to various criminal cases in which he had represented the defendants. During the closing argument for the prosecution a deputy district attorney had this to say: "Do you recall the character of the men that Mr. Allender has been representing since 1892 up to the present date, thirty-three years? Highway robbers, murderers, men of the underworld and he is now defending Alpine. Do you not see back of this case, ladies and gentlemen, the operation of the underworld? Do you not see some peculiar interest on the part of Goldfein, Finkel and Fisher?" We must pause here to remark that these individuals were witnesses who took the stand in behalf of appellant, and who were, apparently, his friends. After his remarks above quoted the deputy district attorney commented on certain activities of Finkel after appellant's arrest and which aided him in his defense, and also to activities of one Berg, another witness for appellant, in the same direction. He also alluded to the circumstances, as to which there was evidence, that appellant had known Blum before the time when appellant testified that Blum took his watch from him, and that appellant had been seen with Blum. The prosecutor also referred to one Snyder, a man who had been mentioned in the testimony as an acquaintance of both appellant and Blum, but who was not a witness.

A statement of these matters is necessary to the understanding of a second point made by appellant to the effect that the deputy district attorney was guilty of misconduct. After referring to the matters above mentioned the deputy proceeded: "You remember when those threats were made [that Blum would kill appellant] according to Finkel, Fisher and Goldfein, on the 30th, the 31st and the 1st, the shooting on the 2nd, the arrest on the 2nd, Finkel was there and not one single word out of Finkel, not one single word from the mouth of the defendant when the officers were taking the statement of the defendant to the effect that threats had been made to Finkel, Goldfein and Fisher. He says they were communicated to him. They say that they communicated the threats to him; they were fresh in his mind at that time, and yet not one single word. I will tell you why. See if it is not logical and reasonable. Assuming

that Barney Blum is a hijacker, that Paul Gibbons [also a witness] is a hijacker, that Snyder is a hijacker, that Goldfein and Alpine have been going around in a Nash with Blum and Snyder. Are they members of the underworld? I am asking you if they get Harry Alpine to go up there on the 2nd day of September, 1925, and get rid of Barney Blum in order to destroy evidence which they thought he had in his possession and which if he 'squawked' would send the whole bunch of them to the penitentiary. . . . " Later, the deputy said to the jury: "How would you like to meet him [appellant] in a dark alley, or down a dark street, you ladies, unattended by an escort, or even attended by a strong escort? How would you like to meet Fisher, Goldfein and Finkel on a lonely street in a dark place unaccompanied and unattended, or even accompanied and attended by an escort? You saw their type upon the stand. You have seen hijackers during the time you have been sitting in this court room day after day and week after week. Do Finkel and Goldfein and Fisher look like innocent little business men to you? Draw your own conclusions." No part of these outbursts was objected to immediately, but they occurred near the end of the argument of the deputy. Shortly before he actually concluded and at the opening of a session after a noon adjournment had been taken the record shows the following: "Mr. Allender: If the Court please, at this time I object to the statement that has been made by [the prosecutor] to the jury just prior to adjournment in which he referred to Mr. Sol Finkel, Mr. Goldfein and Mr. I. Fisher as being members of the underworld, hijackers and that it wouldn't be safe for any member of the jury to meet any one of these men in a dark alley at night. I object to that statement on the ground it is not supported by any evidence, or warranted by any evidence in this case, and assign it as misconduct, and I ask the Court to instruct the jury to disregard it. The Court: As I stated before, it is a matter of deduction that counsel is making during his argument, and that the objection will be overruled, and your assignment is pretty late, but I will allow the assignment." From this the court did not intend to say that he would instruct the jury as was requested, for he gave no such instruction, but only that he would allow the assignment to be presented. The

remarks of the deputy district attorney to which appellant took exception constituted misconduct of an extreme type, and the trial judge erred in not instructing the jury to disregard them. They did not present a legitimate argument upon the evidence before the jury and, moreover, they constituted an impeachment of appellant's witnesses in a manner not contemplated by the law.

[13] Misconduct is charged as to the following showing of the record made during the closing argument: "[A Deputy District Attorney]: I am asking you · as reasonable people and reasoning human beings, Alpine leaving the State of California, after being held up by Barney Blum, because he was afraid Barney Blum was going to kill him, or Alpine borrowing $150 from Barney Blum and fleeing the State of California because of a robbery the man had committed. Mr. Allender: If. the Court please, I am going to make an objection to that statement, and I protest against declarations of that kind from a deputy district attorney closing the case, upon the ground that it is unwarranted by the evidence. There is no evidence to sustain it at all. I assign it as misconduct before this jury, and request your Honor to instruct the jury to disregard it. The Court: It is a matter of deduction being made in the course of the argument and you have your assignment." Here, again, there was misconduct upon the part of the prosecutor and error by the trial judge.

Other claims of error are made by appellant, but we find it unnecessary to consider them.

[14] As required by the provisions of section 4½ of article VI of the constitution, we have examined the entire cause, including the voluminous report of the evidence. We have even read the entire arguments of counsel, covering three hundred pages of typewritten record. From our examination we are of the opinion that the errors complained of have resulted in a miscarriage of justice. It is quite likely that the conviction of appellant was because of the errors and misconduct that are shown by the record. But two witnesses, in addition to appellant himself, testified to specific facts casting light upon the question whether Blum was the aggressor in the encounter which cost his life, and their testimony indicated that he was. In addition to this direct testimony there was circumstantial evidence both

in favor of and against the accused. From the standpoint
of the prosecution the most that can be said is that the
evidence as a whole was quite evenly balanced, but it may
be doubted whether that can be said. In venturing these
observations we can speak only from the showing made by
the record. The jury had an opportunity to observe the
demeanor of the witnesses, and may have had reason to re-
turn the verdict which was found, irrespective of the error
and misconduct which were committed during the trial.
As to this, of course, we can say nothing. From the mere
record, as we read it, the errors may very easily have turned
the scale in favor of the prosecution.

Judgment and order reversed.

Craig, J., and Thompson, J., concurred.

A petition by respondent to have the cause heard in the
supreme court, after judgment in the district court of appeal,
was denied by the supreme court on April 22, 1927, and the
following opinion then rendered thereon:

THE COURT.—The petition for a hearing in this
court is denied. We are not to be understood, however, as
approving that portion of the decision of the district court
of appeal, wherein it is apparently held that a so-called
*voir dire* examination of a character witness would consti-
tute error.