[Crim. No. 2271. Second Appellate District, Division Two.—January 18, 1933.]

THE PEOPLE, Respondent, v. ELEANOR JUDSON, Appellant.

John F. Groene for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

ARCHBALD, J., *pro tem.*—The evidence shows that one Virginia Stewart went with her mother to the home of defendant on February 7, 1932, and that at the time she was pregnant and in apparently good health. She passed away February 9, 1932, the only witness present being the defendant. The circumstances surrounding the death indicated that an abortion had been performed which was not necessary to save the patient's life, and defendant was arrested upon the charge of murder. The jury failed to agree upon a verdict at the first trial, concluded June 7, 1932, and the case was reset for July 6th of that year. In the meantime the public defender of Los Angeles County was substituted as counsel for defendant and the case continued to July 8, 1932. The verdict of the jury was returned July 16th and found defendant guilty of murder in the second degree. At the time set for sentence, July 21st, a motion for new trial was presented, the hearing thereon as well as the passing of judgment and sentence being continued to July 29th. On the latter date defendant asked for a further continuance, which was denied, and judgment was pronounced. From the order denying her motion for a new trial and from the judgment defendant has appealed.

Appellant contends (1) that the evidence was insufficient to support the verdict; that the court erred (2) in admitting the testimony of the witness Fay tending to prove a similar offense; (3) in denying defendant's motion to continue the hearing on her motion for new trial and (4) in denying her permission to file application for probation.

■ 1. The testimony of Dr. Frank R. Webb, assistant county autopsy surgeon, that decedent died as the result of an illegal operation is undisputed, and that fact as well as the fact that no operation was necessary to save the life of the girl is clearly established by the evidence. Such facts were also admitted by counsel for appellant, the defense being that "defendant did not do it at all". It appears that a set of instruments for performing such an operation was found in a cloth bag in an incinerator at appellant's home, ownership of which was admitted by her at the trial, at which she stated she had hidden the instruments in the incinerator because the girl "died under circumstances that I knew an abortion had been started, and I had them". She also testified that she had owned them for ten or twelve years.

At the time the officers were called, on February 10th, they found appellant in her living-room. She appeared to be "extremely nervous" and on several occasions got up from her chair "and would glance through the west bedroom window". One of the investigators then looked out of the window and saw a large oil-drum which had been used as an incinerator. Examining this later he found the bag of instruments. Appellant was asked if she owned any surgical instruments, to which she replied that she did not. Asked as to what she would say if they found some on her place, she replied that she would say they had been planted there. On being shown the instruments and asked if they belonged to her, she said they did not and that she had never seen them before. Footprints led from the house to a trash pile and from there to the drum where the instruments were found, and at the request of an officer appellant produced a pair of shoes which she stated she had worn while working in the back yard and which had fresh mud on them. The shoes thus produced fitted the tracks "perfectly". A small carton containing two broken vials labeled "Pituitrin" was found on the dining-room table.

This was shown by one of the officers to appellant, who when asked if the package belonged to her replied that it did not. Asked as to how it came to be in her room she said she did not know, "unless the girl had brought it there". At the first trial appellant stated that she had purchased the pituitrin at a drugstore at about 9 o'clock P. M. of February 9, 1932.

Appellant testified that about 10 o'clock P. M. on the night of February 9th she went to the kitchen to get a drink of water "and I heard her calling me"; that she "found her out in the back"; that decedent told her "she had jumped off the ladder, or the house"; that she picked the girl up and took her in the house, undressed her and put her to bed; that decedent was "flowing pretty heavily" and that she "cleaned her up", in which process she noticed "that there was a catheter coming out of her vagina" which was "twisted like, and the wire was still in the catheter"; that she thereupon got in her car "and went to the drugstore and bought this pituitrin"; that this was between 10 and 10:15 P. M.; that she called an aunt of decedent, after failing to get her mother, on the telephone, and told her to come quick and bring a doctor; that shortly thereafter the girl passed away.

The officers found a number of holes near the back door which had apparently been made by the heels of a french slipper, and after examining a pair of decedent's shoes found that the heels filled the marks on the ground but at such an angle that the sole of the slipper did not touch the ground, indicating that the heel tracks had not been made by jumping from a ladder. Dr. Webb testified that decedent died from exsanguination following an attempted abortion; that the uterus contained a five months' fetus, placenta and attached umbilical cord; that the amniotic water had been expelled by mutilation of the uterus and the cervix of the uterus, caused "by the apparent use of instruments, or the handling of the parts during the procedure of mutilation"; that the lacerations and mutilations "were all fresh and of the same appearance", and could not have been caused by a fall or jump from any height. The doctor further testified that death occurred following mutilation of the parts; that collapse took place during the

time of mutilation, and that "following collapse, inside half an hour to an hour, death would proceed".

Without reviewing the evidence further we will say that it is amply sufficient, in our opinion, to sustain the verdict and judgment.

2. Called by the prosecution, the witness Genevieve Fay testified that she visited the appellant around the 1st of February of 1932. Asked if she was pregnant at the time she answered in the negative; also that she did not have any conversation with appellant regarding an abortion. Thereupon the district attorney claimed surprise and asked leave to show a document to the witness, which was exhibited to defendant's counsel, for the purpose of refreshing her memory. This was done, by permission of the court, and the witness was then asked: "Having read that document, does that refresh your recollection as to whether or not you were pregnant at the time you went to Mrs. Judson's?", to which she replied: "I don't know whether I should answer that or not." The court then stated: "Yes, you must answer the question, Madam," and the witness replied: "It refreshes my mind all right." Following this, Miss Fay testified that she asked appellant "if she would perform an operation on me"; that appellant packed her uterus with cotton and gauze and told her to come back next day; that she did so and that appellant removed the gauze and told her that she was not pregnant—that she "had fibroid tumors"; that about two weeks after this visit she had a miscarriage. No objection was made to the effect that the document exhibited to the witness was not a proper one from which to refresh her recollection or that no foundation was laid for its use, but objection was made that the statement did not "show any abortion at all".

We think the testimony of this witness was properly admitted, the jury having been instructed that evidence of a similar act is admitted "not for the purpose of establishing the commission of an independent offense by the defendant, but for the sole purpose of establishing guilty knowledge and intent". While this evidence was not as clear as it might be as to just what happened, the inference might well be drawn by the jury that the witness went to appellant in a pregnant condition for the purpose of having an abortion performed, and that such result was obtained,

which circumstance certainly bears upon the intent of appellant as to the decedent in the particular instance under consideration. ▇ Appellant urges that the court erred in compelling the witness to testify, as it was in effect permitting the prosecution to impeach its own witness. We fail to see where there was any attempt at impeachment. The statement shown Miss Fay refreshed her recollection; and no objection having been made as to such use of the document, we must assume that it was a proper document for such purpose. ▇ If appellant means to urge that the court erred in compelling the witness to incriminate herself, a sufficient answer, assuming without conceding that the privilege was claimed by her, is that it was not an error committed as against appellant and therefore not a matter of which she can complain. (*People* v. *Gonzales*, 56 Cal. App. 330 [204 Pac. 1088].)

▇ 3. We fail to see any error in the ruling of the court denying the motion of appellant for a continuance of her motion for a new trial. The verdict was rendered July 16, 1932. The date for pronouncing judgment was set for July 21st at 10 o'clock, at which time an oral motion for new trial was made, hearing of which was set for July 29th, and the matter of pronouncing judgment and sentence was continued to the same date. It would seem that under section 1191 of the Penal Code judgment was required to be pronounced before July 31st, which day was Sunday. (*People* v. *Treschenko*, 159 Cal. 456 [114 Pac. 578].) Assuming, however, that appellant—having asked for the continuance for the purpose of procuring the testimony of a witness named Mrs. McDaniels—was in no position to demand a new trial under section 1202 of the Penal Code, still we see no error, inasmuch as the record shows that she had filed affidavits on April 29th, three months before, asking for a continuance of the trial set for that date in order to enable her to secure the presence of the same witness. Said witness was not produced at either the first or the second trial, and the evidence presented to the court at the time the motion was made did not show any diligent effort to secure her presence at any time. Assuming further, as claimed, that the witness mentioned would testify that some unknown doctor had performed the operation on decedent some time before she went to appellant's home,

still the evidence could not have availed appellant in the face of the undisputed fact that such act could not have possibly been performed prior to the time the decedent arrived at appellant's house. At the hearing of the motion for new trial the witness who testified that she had had some such a conversation with the missing Mrs. McDaniels was asked if she knew that the latter would so testify. Her reply was: "I couldn't swear to it, of course."

4. We see no abuse of discretion in the refusal of the court to permit the filing of an application for probation. Probation was summarily denied, and such action is purely discretionary under section 1203 of the Penal Code. In denying the application the trial judge very frankly said: "I regret to state that I do not believe this is a proper case for probation. The nature of the crime committed by the defendant, resulting as it did in the loss of life of a young girl eighteen years of age, is not one that would commend itself to the court even if the defendant proved to be a woman of the best of reputation. It is not a proper case for probation and the application is denied." In any event, a refusal to entertain an application for probation after conviction cannot be reviewed on appeal, as such matter rests entirely in the discretion of the trial court. (*People* v. *Dunlap,* 27 Cal. App. 460 [150 Pac. 389]; *People* v. *Laborwits,* 74 Cal. App. 401 [240 Pac. 802]; *People* v. *Purkitt,* 75 Cal. App. 148 [242 Pac. 81].)

Appellant urges that she is entitled to a dismissal under section 4½, article VI, of the Constitution. We fail to understand such contention. Under the section cited, even though we were convinced that the trial court erred in the particulars referred to, the judgment could not be set aside or a new trial granted in view of the fact that after an examination of the entire cause we are unable to say that a miscarriage of justice has resulted therefrom.

Judgment and order affirmed.

Works, P. J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 30, 1933, and an application by appellant to have the cause heard in the

Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 15, 1933.