[Crim. No. 5847.   Second Dist., Div. Two.   July 16, 1957.]

THE PEOPLE, Respondent, v. SAMUEL GOLDBERG, Appellant.

564

James A. Starritt, Rose & Rose and Bernard Rose for Appellant.

Edmund G. Brown, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Respondent.

MOORE, P. J.—Having been convicted of a conspiracy (Pen. Code, § 182) to commit the crimes of theft and forgery, to cheat and defraud by criminal means and falsely to publish bills, notes and checks with intent to defraud persons (Pen. Code, §§ 470, 484), appellant seeks a reversal of the judgment and the order denying the motion for a new trial on the grounds: (1) insufficiency of the evidence, (2) admission of evidence obtained by illegal seizure, (3) no overt act proved, and (4) withdrawal and entrapment.

The information was filed July 30 and the judgment was entered November 7, 1956.

The conspiracy charged was formed by appellant with defendants Huling and Atkins who were also convicted. Their purpose evidently was to forge fictitious names to fictitious checks of their own creation ostensibly to be the checks of Douglas Aircraft Company and to cash them by means of engaging other persons to present them to divers business establishments for payment.

About June 1, 1956, defendant Huling in Inglewood asked James Ream, a resident there, whether the latter knew any person from whom he could obtain a check from the Douglas Aircraft Company; he said "he wanted to make some duplicates of that check . . . said he would make it worth my while." He stated that he would make a present to Ream "and it wouldn't be jelly beans." Ream told him that Hank[1], his roommate, worked at Douglas. Later, Huling delivered to Ream $60 with which to acquire the Douglas check. Ream was evidently not at first successful. Two weeks after such

---

[1]Hank was the nickname of his roommate, Brice Golliher.

conversation, Huling by telephone asked Ream to meet him on Hawthorne Boulevard at 182nd Street. There he introduced Ream to appellant Goldberg, and the three discussed the possibility of getting the Douglas check. Appellant stated that he would see to the making of the duplicates and Huling assured Ream that the mortgage on his house would be greatly reduced "when we get through." Four days later [June 21] Huling telephoned Ream to return the $60. "Mr. Huling and Mr. Goldberg told me they had to have the money back to give to someone else." After the last-mentioned conversation, Mr. Ream conferred with Officer Dell-Imagine. Officer Mott watched from across the street when Ream returned the $60 to Huling and Goldberg. On June 25, Dell-Imagine received from Officer Mott a Douglas Aircraft check payable to Brice Golliher in the sum of $53.32, drawn on the Hawthorne branch of the Bank of America. When Dell-Imagine met Mr. Ream on the same day, they agreed to meet Huling and appellant at 1 p.m. After the officer installed a Minifone on the person of Ream, the two proceeded to Torrance where they were met by Huling and appellant in a 1955 automobile. To them Ream introduced the officer as "Hank." Dell-Imagine handed them the Douglas check and Ream expressed concern about the return of "Hank's" check because the latter was short of funds. They discussed a smooth manner in which to pass fraudulent checks, such as leaving legitimate identification at home. Ream asked how they were going to get around the driver's license deal. Huling said "that's just like falling off a log. What . . . do you think a camera's for? And I've only got five cameras at home." Appellant Goldberg said, "I saw one this morning—a camera—that cost five thousand dollars. It was in a place where they make offset plates. It's a great big . . . thing, but it's a beautiful thing. . . . They can take any kind of a picture with that.

" 'Max: [Huling] No. You see here——

" 'Sam: [Goldberg] Pardon me. I could even get him to print these checks offset. 'Course I wouldn't want serial numbers on it and he would do it without a squawk.

" 'Max: Well, that part of it is your baby, Sam. I'm not telling you that. I've organized this . . . thing. It's taken me a long, long time to build up to it. As a matter of fact, Sam, I'll tell you, it has been more than a year. I knew him more than a year before I even broached the subject for him— to him.

" 'Sam: And then I think—it took him about two months to get me in line.' "

Appellant promised "Hank": "The only ones who will see your name on that check is Max and myself. It's not going out of our hands"; that the serial numbers would not appear on the other checks. In the conversation it was stated that defendants would print the checks; they would use "Hank's" check as a pattern; they would set the type and return the borrowed check to "Hank." Huling told "Hank" that there was a chance for him to make $6,000 in three days; that the passers of the checks would get 25 per cent of their collections. "We will have ten men working in groups of two. . . . We will give you one check. Tell you where to cash it." Appellant calculated that it would take about a week before the authorities could catch a "phony" check. Huling told "Hank" to bring along his friends and they would take them in on the deal. After Ream and "Hank" had left, appellant had possession of the check.

Mrs. Atkins testified that Mr. Goldberg brought the Douglas Aircraft check in for Mr. Atkins on June 26th, that Huling was with him but did not enter into the conversation.

When "Hank" went to appellant's home on June 30th, appellant told him that he desired to take him by the offset printer who was to print up the checks. They called at the shop on Venice Boulevard where appellant introduced "Hank" to the proprietor, Atkins, as "the man who works at Douglas Aircraft and it is his check you photographed." Atkins told them that "if you want a real good job, you shouldn't handle the check or fold it, as the camera picks up everything." Appellant said, "Well, I have a piece of celluloid down at the office that I will give Hank, that he can place his pay roll check in that so it won't become soiled or bent." After Huling joined them at Goldberg's office, appellant gave "Hank" a celluloid envelope, whereupon the officer placed the two men under arrest. About 6:30 p.m. at the Police Building, Officer Dell-Imagine read the transcript of the Minifone conversation of June 25th and asked appellant whether he remembered the conversation and he stated that he did.

Two days later, the officers called at the print shop on Venice Boulevard, found Atkins there and placed him under arrest. A search revealed (1) a negative of the Douglas Aircraft check dated June 22, 1956; (2) a negative of an operator's license; (3) a photostatic copy of a duplicate operator's license.

### EVIDENCE IS SUFFICIENT

Such evidence is sufficient to establish the conspiracy

alleged. ■ A criminal conspiracy is an unlawful agreement of the persons to commit an offense denounced by statute. ■ Its legal existence can be established only when proof thereof is accompanied by competent evidence of an overt act. ■ It may be proved by either direct or indirect evidence. It is usually proved by a recital of the circumstances. ■ After proof of a conspiracy, the act or declaration of a conspirator outside the presence of his confederates involving them, relating to the conspiracy may be received in evidence. (Code Civ. Proc., § 1870, subd. 6; *People* v. *Curtis*, 106 Cal. App.2d 321, 325 [235 P.2d 51].) Where such declaration or act forms a part of the transaction which is in dispute, such declaration, act or omission is proper evidence. (*Ibid.*) ■ When an agreement is not in writing, parol evidence is admissible to prove its contents and where the conspiracy was oral, proof of the conversations of the parties tending to establish their agreement is evidence of the very fact to be proved and is therefore proof of the *res gestae*. (Code Civ. Proc., § 1850; *People* v. *Collier*, 111 Cal.App. 215, 240 [295 P. 898].) ■ Of course, the proposed testimony of a witness who would relate a conversation he had had with an alleged conspirator is hearsay until after the conspiracy has been established. While the agreement may be inferred from the conversations or acts of the alleged conspirators (*People* v. *Benenato*, 77 Cal.App. 2d 350, 358 [175 P.2d 296]), yet if perchance any two conspirators tacitly reach a mutual understanding to commit a crime, their agreement constitutes a conspiracy. (*People* v. *Sisson*, 31 Cal.App.2d 92, 97 [87 P.2d 420].) ■ If it is shown that the defendants with a view to accomplishing the same purpose, pursued it by their own acts, each performing some part thereof, the trial court is justified in concluding that they were engaged in a conspiracy to effect their common object. (*People* v. *Lawrence*, 143 Cal. 148, 154 [76 P. 893, 68 L.R.A. 193].)

■ With such principles and authorities in view, there is no reasonable basis to impugn the sufficiency of the evidence to support the judgment in the case at bar.

From the recited conversations it was necessarily inferred that appellant and Huling would together obtain a genuine Douglas Aircraft Company check to be used as a model by the conspirators; that from such model they would make check forms bearing the imprint of the Douglas corporation with lines for dates, amounts, the ostensible signature of the company's official. After appellant had met with Huling and

Ream on June 21st at 182nd Street and received from Ream the $60 they had given him for the purpose of obtaining the Douglas check, the stage was set for the appearance of Hank Golliher. That occurred when on June 25th, Officer Dell-Imagine, bearing the soubriquet of "Hank" and the coveted Douglas check was introduced to appellant and Huling. Ream said "Hank" was short of funds. "Hank" asked appellant how many checks could be made and was told: "from this one you can make a million" and Huling added: "We're going to print the checks ourselves. . . . We want to use this as a pattern"; the check passers would get 25 per cent of the sums collected; one might make $6,000 in three days' work; the men would be told where to cash the checks; they would bring back the loot and get their next check; it was not an overnight deal; he had studied it for three years; they had rejected a counterfeiting deal because it was a "federal rap"; that this was a state deal and the charge would be uttering, a felony or a misdemeanor. In either event, it was not extra-dictable from Mexico; that by Sunday night an individual should be able to pass out three hundred "phony" checks.

After Huling had explained that one check passer had cashed $300,000 worth of checks, appellant remarked: "He's been at it steadily for ten years . . . it will take about a week before they catch one of the checks. Huling said: "We'll get a can of collodion so we'll coat your fingers with collodion." Goldberg thought the fingerprints would be obliterated by all the persons touching the checks. The conversation demonstrated that (1) they had previously agreed to have the "phony" checks printed and to have men pass them by using false identifications and (2) they were promoting the project by getting the Douglas check from "Hank" and offering that he might become a check passer.

What more could be necessary to show the corpus delicti of a criminal conspiracy? By the conversations it was established that appellant and Huling had agreed to make the check forms, fill their blank spaces with fictitious sums and names and sign and pass them by use of the fraudulent acts of others, dividing the "loot" among the passers and the conspirators. The acts and the declarations were circumstances created by the confederates and they proved a bold conspiracy to pirate upon the economy of the community in general and upon the Douglas Aircraft Company in particular. On June 30th appellant appeared to be zealous to demonstrate to "Hank" that appellant was the king pin in the

flourishing enterprise. They had preparations almost completed. Vast wealth lay within reach. On that day, appellant took the officer still posing as Hank, and paid a visit to the print shop. The conversation there indicated that he was eagerly at work to accomplish the aims of the conspiracy. The apparent intimacy of appellant with Atkins, and the latter's intimation that he had done work to advance the interests of the conspirators justified a finding that Atkins -was in league with them as their printer. Atkins talked about a big real estate deal but when "Hank" asked whether he desired "us" to drop this check deal, Atkins said, "No, don't drop no deals; every deal's a good deal." That meeting at Atkins' shop was the keystone of the proof of the conspiracy. It established appellant's purpose and his work to effect it. The elements of the corpus delicti had been established. The conversation proved that appellant and Huling had agreed to obtain a Douglas Aircraft Company check for Atkins to use as a form to photograph and print. (*People* v. *Dixon,* 94 Cal. 255, 257 [29 P. 504] ; *People* v. *Sherman,* 127 Cal.App.2d 230, 237 [273 P.2d 611].) Such meetings as were held without appellant might be eliminated from consideration and still the remainder where he was present make a complete picture of an impudent trio striving to deride the law and to rob the innocent of huge sums of money. It is not our duty to weigh the evidence. That obligation rested with the trial court and now when the sufficiency of the evidence is attacked, the finality of the decision may be questioned only in the event this court should decide that "upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt." (*People* v. *Newland,* 15 Cal. 2d 678, 681 [104 P.2d 778].) The above cited and quoted evidence generously convicts appellant as one of the accused conspirators who cheerfully organized and attempted to effect an ugly, detestable crime.

### ALLEGED ERRORS

Appellant asserts that Ream could not testify as to the first conversation with respect to the conspiracy for the reason that he was not a conspirator, citing *Taylor* v. *Bernheim,* 58 Cal.App. 404, 409 [209 P. 55] ; *People* v. *Dixon,* 94 Cal. 255 [29 P. 504] ; *People* v. *Irwin,* 77 Cal. 494 [20 P. 56]. The cited decisions are not in point. There was no statutory inhibition against the testimony of Mr. Ream. He possessed all the prescribed qualifications of a competent witness. As he heard

the conversations, he was competent to testify concerning them. (See *People* v. *Alpine*, 81 Cal.App. 456, 464 [254 P. 281].)

The contention that the several conversations were incompetent for the reason that they could not have been had to further the objects of the conspiracy is unreasonable. Appellant bases such contention upon the fact that Ream was a police informer who, as in the case of Officer Dell-Imagine, had no intention of advancing the conspiracy but was out to see that the objects of the conspiracy would not be realized, citing *People* v. *Collins*, 53 Cal. 185; *Woo Wai* v. *United States*, 223 F. 412 [137 C.C.A. 604]. By such citations appellant is deceived. In Collins an attempt was made to establish a burglary by a feigned accomplice who lacked the intent to commit the crime. In Woo Wai the American officers caused the defendants to attempt to bring aliens across the Mexican border, always intending that the law should not be violated and that they would prevent the crime by intercepting the aliens.

It is the law that when officers are informed that a person intends to commit a crime, the officers may afford opportunities for the commission of the crime and cause another person to act with the suspect and to be present at the moment of the crime. Then, if the accused author of the crime commits such overt acts as are necessary to complete the offense, he will not be protected by reason of the presence of the agent so employed by the officers who knew and approved of his encouraging and aiding the perpetration of the crimes. Of course, no act done by a feigned accomplice may be imputed to the criminal actor at the trial. In any event, where an accused is encouraged by the officers, it must be clear that the commission of a crime was not suggested by the officers or their agent. (*People* v. *Lanzit*, 70 Cal.App. 498, 509 [233 P. 816].) It is only where the intent originates with the officer and the defendant is enticed to commit a crime not contemplated by him that he becomes entrapped. (*People* v. *Schwartz*, 109 Cal.App.2d 450, 455 [240 P.2d 1024]; *People* v. *Cherry*, 39 Cal.App.2d 149, 153 [102 P.2d 546].) No such situation occurred in the action at bar. Contrary to appellant's contention, the record discloses that neither Ream nor the officer made any suggestion in furtherance of the conspiracy or of any act done toward its fulfillment. In no sense did the idea of fraud, deceit, cheating, swindling, forgery, or theft originate with either Ream or the officer.

## Appellant Did Not Withdraw From the Conspiracy

At one time after Ream had received the money with which to reimburse Hank for the Douglas check, appellant and Huling requested Ream to return it that they might give the money to another. Appellant now contends that because the $60 was returned to them, the conspiracy terminated and that he and Huling withdrew from the conspiracy. Nothing was said at any stage of the operations of the conspirators that appellant or anyone was withdrawing or would withdraw from the conspiracy. The conferences in which appellant engaged after the return of the money would warrant the finding that he had no thought of retiring from the congenial company of his coconspirators or of abandoning the enterprise. The fact was that after the money had been returned, a conversation took place at which appellant and Huling outlined their plans for cashing the checks. Nothing occurred then to indicate that the conspiracy had terminated or that anyone had withdrawn. But, conceding the claim that he did withdraw from the conspiracy, his guilt would be firmly established that he had conspired; otherwise, he could not have withdrawn from it.

## Invoking the Cahan Rule

Appellant now contends that the negatives of the check and the drivers' licenses were seized without a search warrant and that admitting them was error. The record is silent as to whether the officers who seized them had a search warrant. In that event their seizure is presumed to have been lawful. (*Hatjis* v. *Superior Court*, 144 Cal.App.2d 426, 427 [301 P.2d 44].) Moreover, at the trial no objection on that ground having been made, it is presumed to have been waived. (*Imperial Valley Land Co.* v. *Globe Grain & Milling Co.*, 187 Cal. 352, 359 [202 P. 129] ; *Moran* v. *Bromley*, 112 Cal.App.2d 520, 525 [246 P.2d 1001].) In *People* v. *Brooksher*, 134 Cal.App.2d 266, 268 [285 P.2d 298], it was held that such objection in the appellate court was too late and that such rule was not altered by *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905]. Since the instant cause was tried after the Cahan decision was rendered, appellant had knowledge of the law and still he made no objection to their admission in evidence on the ground that they had been unlawfully seized. It cannot be made now. (*People* v. *Showers*, 90 Cal.App.2d 248, 255 [202 P.2d 814].)

## EVIDENCE DISCOVERED AFTER CONSPIRACY ENDED

During the operations of the conspiracy, appellant accompanied Officer Dell-Imagine to the print shop of defendant Atkins where he made inquiry concerning the Douglas check. By reason of the fact that the evidence showed that appellant, Huling and Atkins had planned to photograph the check and to prepare false operators' licenses, the existence of the check and the drivers' licenses became a material and important fact in the series of events that constituted proof of the conspiracy. Therefore, the discovery of such evidence in the possession of Atkins after the conspiracy had concluded was a fact that securely tied appellant in with the conspiracy. Appellant asserts that the admission of evidence found in the possession of a coconspirator outside the presence of appellant was error and cites as authority *People* v. *Zoffel,* 35 Cal.App.2d 215, 220 [95 P.2d 160]. That decision is not authority for appellant's contention. The cards offered against Mrs. Zoffel were not shown to have been in her handwriting nor was it proved that she had ever been in the apartment in which the cards had been found. In the instant action, Atkins had actively cooperated with appellant in developing the objectives of the conspiracy. His possession of the effects used by the conspirators definitely proves the conspiracy and identifies appellant as a part thereof.

## A STEALTHILY RECORDED CONVERSATION

When Officer Dell-Imagine, posing as Hank, and accompanied by Ream, entered the automobile of appellant, he was invited to take the ride. Even though Ream wore a concealed Minifone, neither of them was a trespasser. Because Ream recorded the conversation, appellant contends that he violated the inhibition against unreasonable search and seizure provisions of the state Constitution and the Fourth Amendment. Not so! He violated neither law nor contract. He did not become a trespasser merely because he was ready and eager to hear and record what the enemies of the State might say. (*People* v. *Avas,* 144 Cal.App.2d 91, 99 [300 P.2d 695]; *On Lee* v. *United States,* 343 U.S. 747, 751 [72 S.Ct. 967, 96 L.Ed. 1270].) The recorded conversation which occurred in the automobile was the result of a prearranged meeting. In no sense was it inadmissible as the product of an unreasonable seizure.

## REFRESHING A MEMORY

Appellant asserts error by reason of the court's allowing

Officer Dell-Imagine to refresh his memory by use of a transcript. The conversation of June 25th had been recorded while the conversation was still fresh in the officer's memory. He found the transcript accorded with his recollection of the conversation. At the preliminary hearing on July 17 he could not recall the conversation without reading the transcript to refresh his memory. Having done so, he testified to the occurrences recorded. Objection was made that the corpus delicti had not been proved and that extrajudicial statements were not competent to prove it. ■■■ Inasmuch as appellant did not at the trial assert the lack of foundation for the use of the transcript, he thereby waived it. (*People* v. *Judson,* 128 Cal.App. 768, 772 [18 P.2d 379].) But even though that objection had been made, it should have been overruled. ■■■ The transcript of a conversation recorded by a witness is on a parity with the handwritten transcript of a conversation which may be used to refresh the memory of him whose hand had recorded the conversation. (Code Civ. Proc., § 2047.) The recording of the conversation was made by the officer or under his direction. That fact entitled him to read its transcript to refresh his memory. (Code Civ. Proc., § 2045; see *People* v. *Amaya,* 44 Cal.App.2d 656, 658 [112 P.2d 942].) ■■■ A witness may refresh his memory from a copy of the original record where he has compared it and swears that it is an exact copy. (*People* v. *Brown,* 3 Cal.App. 178, 179 [84 P. 670]; *People* v. *Deckert,* 77 Cal.App. 146, 148 [246 P. 157].) In *People* v. *Burns,* 109 Cal.App.2d 524, 539 [241 P.2d 308, 242 P.2d 9], the inspector testified that he had examined the transcribed statement made by the reporter and that it correctly contained his questions and the defendant's answers. Thereupon, he testified to the events reported in the transcribed statement. As such witness he occupied a position similar to that of a stenographer who had written the stenographic notes from which he made the transcript. (*People* v. *Zammora,* 66 Cal.App.2d 166, 224 [152 P.2d 180].)

The complaint that there was no testimony that the transcription was under the officer's direction cannot now be heard. That was not included as ground for objection. If it had been, Officer Dell-Imagine would have had opportunity to give the suggested proof. But as it was, he testified he installed the Minifone on Ream before the automobile ride on June 25th, approved the transcription on the 28th while the conversation was still fresh in his memory, and had prepared copies for defendants' attorneys and the judge. On cross-

examination by appellant's counsel, no question was directed to the recording made on the 25th in the automobile, but only to the conversation on June 30th at the printshop which Dell-Imagine had recorded. It was not offered in evidence.

There was neither proof of illegal seizure nor of illegal evidence of the conspiracy admitted. No search was made before the arrest of Atkins; no paper or devices seized. The officers had witnessed the acts of the conspirators and believed Ream's narrative.

### Consult With Counsel

■■■ The contention that appellant was not allowed to consult with counsel until after his release is utterly without merit. There is not a word in the record to support the contention. It is appellant's duty to present a record of any error upon which he relies. (*People* v. *Gilpin*, 38 Cal.App.2d 24, 26 [100 P.2d 356].)

### Compelled To Make A Statement

Likewise, there is no record of appellant's having been compelled to make a statement which could be used against him. Not the slightest or mildest threat against appellant is found in the record. Neither does appellant in his brief assert a threat or intimidation. In the absence of such showing, it was not error to admit proof of appellant's conversation. Moreover, where statements of an accused did not amount to a free and voluntary confession, but were only admissions of fact, it was not error to admit them. (*People* v. *Garcia*, 124 Cal.App.2d 822, 826 [269 P.2d 673].)

### Denial of Probation

Appellant says he "does not care to go further into the question of the probation report" but suggests that the hearing on probation is only partially reported in the transcript. ■■■ Just what he would have this court do with the judgment that he be imprisoned in jail for a year is not indicated but it might be gathered that he preferred probation. Evidently neither the court nor its probation officer chose to grant his motion. The award of such privilege is not a right. It is a mere act of clemency which in many cases is wisely granted in the sound discretion of the court. (*People* v. *Wahrmund*, 91 Cal.App.2d 258, 262 [206 P.2d 56].) ■■■ Section 1203.1 of the Penal Code permits the court to make an order suspending execution of sentence and such other orders as it may determine proper under the circumstances of the

defendant "to the end that justice may be done." Nothing occurred at the hearing on probation that was not authorized by the cited section. Moreover, it is presumed that the probation report was made in conformance with such section and that the court's order was made in conformity therewith. (Code Civ. Proc., § 1963.) Inasmuch as the report is not contained in the record, there is no proof to overcome the presumption of legality. (*People* v. *Wilson*, 123 Cal.App.2d 673, 674 [267 P.2d 27].) Even though it contained statements of persons who were not called as witnesses, there is no showing that such fact constituted error or that it caused the court unjustly to imprison appellant in the county jail for one year. The action was courageously and patiently tried and the judgment is a very mantle of kindness.

Judgment and order affirmed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied Auugst 13, 1957, and appellant's petition for a hearing by the Supreme Court was denied September 11, 1957.