[Crim. No. 1103. Fourth Dist. Aug. 21, 1956.]

THE PEOPLE, Respondent, v. GEORGE AVAS et al., Appellants.

*Assigned by Chairman of Judicial Council.

Head, Jacobs, Corfman & Jacobs for Appellants.

Edmund G. Brown, Attorney General, and Leo J. Vander Lans, Deputy Attorney General, for Respondent.

BURCH, J. pro tem.*—On October 25, 1954, MacKenzie, Avas, and Mickey Jones, also known as Elsie Helen Gragg, were indicted by the Orange County Grand Jury. Count I charged them with the violation of Penal Code, section 182, a felony, "conspiracy of asking or receiving bribes by public officers." Count II of the indictment charged Avas and MacKenzie with violation of Penal Code, section 68, a felony, "asking and receiving bribes by public officers or employees." Count III charged Jones and MacKenzie with a violation of Penal Code, section 68. Count IV charged Avas with grand theft under Penal Code, sections 484 and 487. Count V charged Jones with grand theft under Penal Code, sections 484 and 487. Defendant MacKenzie pleaded not guilty to all counts in which he was charged. On March 28, 1955, the district attorney moved to dismiss as to defendant Jones, and stated she had been offered immunity and would testify for the People. The motion was granted by the court. At the trial verdicts were returned by the jury as follows:

" 'Count I: Appellant and defendant Avas, "Guilty";
" 'Count II: Appellant and defendant Avas, "Guilty";
" 'Count III: Appellant MacKenzie, "Guilty";
" 'Count IV: Defendant Avas, "Acquitted".' "

The defendant Avas died on October 23, 1955, and a photostatic copy of his death certificate has been filed with the

---

'Assigned by Chairman of Judicial Council.

court. Defendant MacKenzie appeals from the judgment and order denying a new trial.

In the conspiracy count (I), 20 overt acts were alleged calculated to influence the defendant MacKenzie in promoting the issuance of liquor licenses. In support of Count II it was alleged that the defendants MacKenzie and Avas did ask, receive and agree to receive from Jack Kennedy a bribe of $7,500. In Count III Jones and MacKenzie are alleged to have asked, received and agreed to receive a bribe of $8,000 from Ross W. Gray.

The case proceeded to trial on March 28, 1955, and continued to May 12, 1955. MacKenzie's motion for new trial was denied on July 21, 1955, and he was sentenced to the state prison for the term prescribed by law as to each of the counts on which he was found guilty, the sentences to run concurrently.

The Board of Equalization of the State of California had the authority and responsibility of the issuance of liquor licenses in various counties of the state. Defendant MacKenzie was District Liquor Control Administrator for the counties of San Bernardino, Riverside and Orange. He had his office in the city of San Bernardino. Working under him were William C. Elledge, Supervising Control Officer for San Bernardino County, with his office in San Bernardino, William F. Boland, Supervising Liquor Control Officer for Riverside County, with his office in Riverside, and Herman Pause, Supervising Liquor Control Officer for Orange County, with his office in Santa Ana. Under the rules of the Board of Equalization licenses were limited to one for each 1,000 population. Following the 1950 census it was determined that additional on-sale general licenses—known as "P" licenses—might be issued. Rules respecting the application therefor were promulgated by the Board of Equalization. MacKenzie's immediate supervisor was William G. Bonelli, a member of the Board of Equalization, with whom MacKenzie conferred before applications for the new licenses were accepted from the counties under his supervision. Several hundred people made inquiry in the Santa Ana office about licenses, and only about 50 were permitted to make application, and but 45 were issued. Only on MacKenzie's approval could a form of application be given to an applicant.

The manner of receiving applications and the method employed in issuing licenses became the subject of inquiry by

the attorney general's office. This investigation has resulted in many indictments against individuals for conspiracy and grand theft outside of Orange County, as well as the one present before us now. The charge of conspiracy and accepting bribes are essentially based upon transactions between defendants and Jack Kennedy, of Costa Mesa, and Ross Gray of San Juan Capistrano.

Defendant's Point I goes to the sufficiency of the evidence to prove conspiracy (Count I). Ross Gray testified that he owned and operated the Capistrano Hotel. In 1952, Gray visited the Santa Ana office of the Board of Equalization in an attempt to get an on-sale general liquor license. He was refused the right to get an application but he was sent to see MacKenzie in San Bernardino, to whom he stated that the hotel desperately needed a liquor license which was unavailable through legal channels, "but if there were other ways of getting it" he was in a financial position to cooperate. Defendant replied: "that he wasn't in a position to help me get a license, but he thought he knew someone that was, or could help me get one, and that if I went to the Antler's Hotel and sat around the lobby or the bar for a while I may get a phone call from that person." After making the promised phone call a woman, Mickey Jones, met him at an appointed place in a Cadillac Coupe de Ville. She required that Gray meet her at the Majestic Café in Santa Ana and have $8,000. "I gave Mickey Jones the $8,000 and said 'Now what do I do?'" At Mickey Jones' direction Gray went to the Board of Equalization office in Santa Ana and received and filled out an application. In about three weeks' time he received his license. Following the attorney general's investigation MacKenzie told Gray to "say nothing."

Mrs. Jones testified that MacKenzie told her in September, 1952, at her home in Crestline, that he planned to sell licenses for one-half their market value and retain for himself 40 per cent thereof. Sometime in September, 1952, at MacKenzie's direction, she met Gray who said to her, "I have been trying to get a liquor license and I was told to come out here and meet you." "I told him his license would cost $8,000." She met him later and received currency which she put in a bag and gave to MacKenzie, at her home in Crestline.

Jack Kennedy testified that he had known MacKenzie for a number of years; that they had been fellow police officers at Newport Beach; that he operates the Liquor Mart at

Costa Mesa; that in early 1953 he talked to Herman Pause at the Board of Equalization office and other places in Santa Ana. Kennedy asked Pause "Is there any chance at all of getting a cocktail license?" Pause replied: "Definitely no, there are not any of them being issued at this time." In June, 1953, Kennedy talked to Ray Amendt about a license following which he went to the Majestic Café in Santa Ana operated by Avas and asked to get a liquor license, and Avas told him it would cost $7,500 and asked if Kennedy could raise the money, to which Kennedy replied in the affirmative and Avas said "Well I will be in touch with this party in the next day or so and I will see what I can do for you." Two weeks later Avas told Kennedy that "Mac would be going to Sacramento in the next day or so, and he'd probably have some news for me." Later, Avas told Kennedy by phone he was ready for his money, "everything was all set for my license." Kennedy collected together $7,500, put all the money in bills of $100, $50, $20 and $10 denominations in a paper sack which he took to the Majestic Café at Santa Ana, and gave the $7,500 to George Avas on July 16, 1953. Avas counted it and said "Yep, Thats it." Some days later Avas told Kennedy to call MacKenzie, which was done. MacKenzie told Kennedy "to relax, everything was going to be all right, not to worry." That was the first conversation between Kennedy and MacKenzie about the license. On July 30, Avas directed Kennedy to the Santa Ana Board of Equalization office to make application for the license. In two or three weeks Kennedy had the license. Thereafter, MacKenzie helped Kennedy find his location at Costa Mesa where the license became operative. MacKenzie told Kennedy he had paid his share and would not have to make other election contributions. MacKenzie told Kennedy he (MacKenzie) had testified before the San Diego grand jury. "I asked Mr. MacKenzie if he thought the investigation was going to get up this way, into Orange County, and he said yes he wouldn't be surprised if it went all the way up the coast, and I said, 'Well, somebody better come up with some answers' and he says, 'Well, we have been friends for 20 years. Isn't that reason enough for me to get you a license?' George (Avas) says, 'Jack, I want you to know one thing: that I never got a dime of that money,' and, you know I believe him." Kennedy valued his license at $13,500.

The above is but a partial extract of 1,730 pages of transcript, but clearly establishes an agreement of MacKenzie

and Jones to obtain bribes, and the success of the plan of action adopted by them in the transactions with Kennedy and Gray. Jones picked up the Gray bribe at MacKenzie's directions and turned the money over to him. (See *People* v. *Bennett,* 132 Cal.App.2d 569 [282 P.2d 590]; *People* v. *Bompensiero,* 142 Cal.App.2d 693 [299 P.2d 725]; *People* v. *Lyon,* 135 Cal.App.2d 558 [288 P.2d 57].)

Unlike the last cited liquor cases we have here immunity given one of the conspirators and direct evidence by her of the essential elements of the charges. ▆ Mickey Jones was an accomplice, a party to the combination and active in carrying out its object. (*People* v. *Walker,* 88 Cal.App.2d 265 [198 P.2d 534]; *People* v. *DePaula,* 43 Cal.2d 643 [276 P.2d 600].)

▆ On the last cited authorities Kennedy and Gray were not accomplices, as their offenses were not identical. ▆ It was held in the Bennett case, *supra,* (132 Cal.App.2d, p. 581) that the one who gives the bribe is not an accomplice of the receiver of the bribe. ▆ The credibility and weight of Mickey Jones' testimony were for the jury. (*People* v. *Dail,* 22 Cal.2d 642 [140 P.2d 828]; *People* v. *Malone,* 82 Cal. App.2d 54 [185 P.2d 870].) But it is necessary under section 1111, Penal Code, that the corroborating evidence of Gray and Kennedy must be considered "without the aid" of her testimony and the corroboration is not sufficient if it requires the interpretation and direction of the Jones testimony to give it value. (*People* v. *MacEwing,* 45 Cal.2d 218 [288 P.2d 257].) Jones' testimony might and could be found to have established the corpus delicti. (*People* v. *Bonilla,* 124 Cal.App. 212, 215 [12 P.2d 64].) ▆ MacKenzie's refusal to allow either Kennedy or Gray to fill out forms of application until after Gray had paid the bribe to Jones in response to MacKenzie's suggestion and Kennedy paid Avas; MacKenzie's assurance to Kennedy that everything was going to be all right, not to worry; MacKenzie's remark as to the justification of allowing Kennedy to get a license, and, Kennedy's release from further "campaign" contributions are all circumstances amply corroborative of Jones' direct testimony of the combination, plan of operation, and success in carrying it out. We need concern ourselves no further with the sufficiency of the evidence.

▆ The court also admitted evidence of other transactions wherein MacKenzie directed Jones to contact applicants for licenses, advise them of the cost, collect the bribe in the

form of cash and deliver it to MacKenzie, all followed by the acceptance of an application authorized to be executed and the issuance of a license in due course. There was also evidence of a transaction with Paul Thetford who operated Ted's Café at Joshua Tree, San Bernardino County. In the year 1952, he went to MacKenzie's office and offered a bribe of $3,000 to procure a license. MacKenzie raised the price to $4,000, which thereafter Thetford paid to an intermediary and then in due course received his license. This evidence has probative and corroborative value. It is used not to show a criminal disposition but because it "tends logically and by reasonable inference" to establish facts "material for the prosecution" and "to overcome any material fact sought to be proved by the defense." (*People* v. *Costa*, 40 Cal.2d 160, 167 [252 P.2d 1].) Moreover, it was used to show the existence of "a plan, scheme, system or design" and not to prove other and distinct offenses. (*People* v. *Peete*, 28 Cal.2d 306 [169 P.2d 924] ; *People* v. *Grimes*, 113 Cal.App.2d 365 [248 P.2d 130].)

Defendant's main contention concerns the use of wire recordings of conversations, between defendant and Mickey Jones on January 7, 1955, had in her automobile, and especially a conversation at MacKenzie's home on January 10 in which the three defendants named in the indictment participated. Special agents of the attorney general's office arranged with Mickey Jones that she have a microphone concealed under her clothing when the meeting occurred in the MacKenzie home. The special agents of the attorney general's office recorded the conversation which transpired by means of an apparatus installed in their own automobile parked on the street near the defendant's home. At the trial excerpts of the recordings were read to the jury. This evidence was damaging to defendant's direct testimony and corroborative for the People. MacKenzie is talking and says: "Mickey, if they had all this information, don't you know they would sink you and me and everybody, by indicting everybody right down the line on this thing?" "Of course, they would." "If you don't think that they give everybody the works on this, uh . . . you're crazy. Hell, you . . . you know, the lucky part of this is there's only one or two."

Defendant argues that the use of these recordings, obtained as they were, contravenes the unreasonable search and seizure provisions of the State Constitution (art. I, § 19) and also the Fourth Amendment of the Constitution of the United

States. We do not agree with the defendant's position. In both the cases of *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905] and *People* v. *Tarantino*, 45 Cal.2d 590 [290 P.2d 505], there was criminal conduct in the way of unlawful entry, a breaking and entering without the will of the defendant. In the present case, the element of unlawful entry is absent.

One invited to enter is not a trespasser. His entry does not become a trespass because he may be alerted to learn facts or to hear damaging declarations either by his natural faculties of hearing and sight or with mechanical and electronic aids of science. *On Lee* v. *United States*, 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270] draws this distinction after an extensive review of the search and seizure cases of the United States courts. Justice Jackson, who wrote the court's opinion, states (p. 753) : "But such decisions are inapposite in the field of mechanical or electronic devices designed to overhear or intercept conversation, at least where access to the listening post was not obtained by illegal methods."

In the instant case the "listening post" was the automobile of the special agents, and their access thereto was lawful. The peaceful entrance of Mickey Jones into MacKenzie's parlor on his invitation, though she was equipped with a wireless microphone hidden on her person and went there to get evidence, is neither a trespass nor a lawless act. We find no reason to adopt a rule different from that of the On Lee case under our similar search and seizure law. (Art. I, § 19.) Under the circumstances of this case we believe the court properly allowed the jury to hear the evidence obtained with the aid of the microphone hidden on the person of Mickey Jones.

The judgment and orders are affirmed. The appeal taken by the defendant Avas is dismissed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied September 4, 1956, and the petition of appellant H. E. MacKenzie for a hearing by the Supreme Court was denied September 18, 1956.