236 Cal.App.2d 364 (1965)
THE PEOPLE, Plaintiff and Respondent,
v.
HENRY B. ROSS et al., Defendants and Appellants.
Crim. No. 10461. 
California Court of Appeals. Second Dist., Div. One. 
Aug. 6, 1965.
 Erling J. Hovden, Public Defender, under appointment by the District Court of Appeal, Paul G. Breckenridge, Jr., and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.
 Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.
 LILLIE, J.
 A jury found defendants Ross and Madrid guilty of first degree robbery (Pen. Code, 211) and that they were armed at the time they committed the offense. They appeal from the judgment.
 Around 5:30 a.m. on May 7, 1964, Madrid walked into a Chevron service station where Thomas Daulton was working, followed by Ross who pointed a rifle (Exh. 1) at Daulton declaring, "It's a holdup; give me the key to the box" [outside by the pumps]. Daulton handed the keys to Madrid and, pursuant to Ross's command, lay face down on the floor; Madrid returned and told Ross that he had gotten all of the money out of the cash box in front (approximately $60). Defendants worked on the lower half of the safe, but were unable to open it. Ross then took Daulton's wallet out of his back pocket and removed two $2.00 bills which he had for "quite a while" and which were folded in small squares; the first letter of the serial number of one (Exh. 2) was "A" (the corner of the bill was torn off). Later, upon arrival of police Daulton gave a detailed description of defendants, what they did and how long they were there. (Daulton twice identified defendants at the police station and positively identified them at the preliminary hearing and at the trial.)
 Before noon on May 7, 1964, Ross, Madrid and one Deborah Ferguson bought a 1954 Ford from W. C. West for $80; Exhibit 2 with the corner torn off comprised a part of the *367 $80. On Friday, May 8, 1964, around 3:30 a.m., Ross and Madrid were stopped by Officer Ide because the rear license plate of the Ford was not illuminated. The officer noticed the butt of a rifle (Exh. 1) under a blanket in the rear seat and arrested them. At the Hollywood police station Officer Turner talked to each defendant about five minutes. On Friday, Saturday, Sunday and Monday before arraignment, the police continued to investigate the Chevron station robbery. Twice Daulton was brought to the station to identify defendants. On Monday, May 11, 1964, Officer Turner talked with them "a couple of minutes each" at the Los Angeles Police Building. They were then placed in adjoining cells where, without their knowledge a microphone was hidden to pick up whatever conversations they might have between themselves in their cells. The conversations were monitored to another room where they were recorded and Officer Turner listened. Defendants were not advised of their right to counsel, nor were they told that their conversation would be monitored and recorded. Thus, a tape recording was made of their conversations commencing at 10:25 a.m. The recording consisted of about two hours of general conversation between the defendants. However, because it was lengthy and contained much extraneous material, it was not played to the jury; instead Officer Turner, who listened to the entire conversation monitored to him in another room, testified to what he heard relative to the Chevron holdup. He also explained that this was done prior to arraignment for the purpose of obtaining additional evidence against defendants. He testified that defendant Madrid referred to the victim as "the fat boy," "the little fat boy"; Ross remarked, "We should have blew a hole in him"; Madrid answered, "That's what I wanted to do because I was afraid somebody would get mad at me. We should have blinded him." Around 11:30 a.m., Officer Turner had Madrid brought from his cell; the officer told him that they would soon be arraigned. He asked Madrid if they had anything to say about the robbery of the Chevron station; receiving a negative reply, Officer Turner, picking the figure $240 out of the air, said, "It is my understanding you got two hundred forty dollars." Madrid replied, "I didn't rob anybody." Upon Madrid's return to the cell Officer Turner heard Madrid tell Ross, "They say we got two hundred forty dollars." Ross replied, "No, we only got around one hundred dollars." Madrid corrected Ross: "No, it was ninety or eighty or something like that." At one *368 time Madrid said to Ross, "I am probably more guilty than you because I held the rifle." "Well," answered Ross, "we switched it back and forth." Ross also said, "We stayed in town too long, and we should have got rid of the rifle." On the afternoon of Monday, May 11, 1964, a complaint was filed and defendants were arraigned.
 Neither defendant took the stand. Their defense consisted of the testimony of Deborah Ferguson that she and defendants jointly owned a car which had to be pushed so they pooled their money and paid $90 for another car; she knew the rifle was in the back seat, and it had been purchased for hunting purposes but they neither went hunting nor looked for jobs.
 [1] Appellants contend first that they were illegally detained in that they were not taken before a magistrate within the time provided by law. Under section 825, Penal Code, "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sunday and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following."
 The section excludes legal holidays in the calculation of the period of time within which a defendant must be taken before a magistrate (People v. Hightower, 189 Cal.App.2d 309, 312 [11 Cal.Rptr. 198]); and Saturdays are holidays in the municipal court under Government Code, section 72305. (People v. Mitchell, 209 Cal.App.2d 312, 320 [26 Cal.Rptr. 89].) The record shows that defendants were arrested around 3:30 a.m. on Friday, May 8, 1964, and arraigned in the afternoon of May 11, 1964. It will be judicially noticed that May 9, 1964, was a Saturday and May 10, 1964, a Sunday. (Code Civ. Proc., 1875, subd. 9; People v. Rudolph, 28 Cal.App. 683, 685 [153 P. 721]; People v. Mitchell, 209 Cal.App.2d 312, 320 [26 Cal.Rptr. 89].) Thus, defendants were taken before a magistrate and arraigned on the afternoon of the next regular court session on the second legal business day following the day of their arrest. Excluding Saturday and Sunday, the 48-hour statutory minimum would have expired at 3:30 a.m. on Tuesday, May 12, 1964; thus, defendants were brought before a magistrate "within two days after [their] arrest, excluding Sundays and holidays." *369
 While the evidence shows that from May 8 through May 11 the officers were actively engaged in an investigation of the robbery, the victim was twice brought to the station to identify defendants, and, for the purpose of obtaining further evidence, the officers placed defendants in cells where their conversations could be recorded and monitored without their knowledge, the fact that the officers in the conscientious performance of their duties diligently pursued their investigation of the crime makes neither the delay in taking defendants before a magistrate unreasonable nor their lawful detention invalid.
 [2] In any event, the fact of incarceration at the time of the several admissions, or undue delay in taking a prisoner before a magistrate, does not in itself render the same inadmissible (People v. Bodkin, 196 Cal.App.2d 412, 424 [16 Cal.Rptr. 506]), and while detention would be one of the factors to be considered in determining whether the statements were freely and voluntarily made (Rogers v. Superior Court, 46 Cal.2d 3, 10 [291 P.2d 929], rejecting the federal rule of McNabb v. United States, 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819]), there was in the court below and is here, no contention that defendants did not freely and voluntarily converse together and that the damaging statements were not freely and voluntarily made. [3] The record reveals no behavior by law enforcement officers that overbore defendants' will to resist, nor is there any indication that their admissions were anything but "freely self-determined." (People v. Lopez, 60 Cal.2d 223, 247-248 [32 Cal.Rptr. 424, 384 P.2d 16]; People v. Ketchel, 59 Cal.2d 503, 519, 522 [30 Cal.Rptr. 538, 381 P.2d 394]; People v. Bodkin, 196 Cal.App.2d 412, 425 [16 Cal.Rptr. 506].) There was none of that conduct of law enforcement officers which involves mental or physical coercion, threats or inducement causing defendants to make their various admissions, that is condemned by our courts. (People v. Ditson, 57 Cal.2d 415, 434 [20 Cal.Rptr. 165, 369 P.2d 714]; see also, Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and People v. Dorado (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) Moreover, appellants' contention that had they been arraigned sooner and advised of their rights they would not have voluntarily conversed with each other concerning their crime, besides being purely speculative and highly improbable, is, under the present circumstances, legally without *370 merit. (Rogers v. Superior Court, 46 Cal.2d 3, 10 [291 P.2d 929].)
 [4] Appellants' main contention is that the conduct of the police in failing to advise them of their constitutional rights to counsel and to remain silent and monitoring their conversations with each other in their cells so that they could be heard by the officers in another room and recorded, constituted an unreasonable search and seizure.
 Concerning the applicability of the exclusionary rules set up in Massiah v. United States, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; People v. Dorado (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and People v. Stewart (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], the circumstances here differ substantially from those involved in these cases. In Massiah v. United States, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], a codefendant in cooperation with and acting for federal agents, through his active interrogation, deliberately elicited from defendant incriminating statements which were communicated by a radio transmitter to the police. Defendant had already been indicted and was then represented by counsel. [5] For several reasons the case is distinguishable from the one at bar. Herein, the admissions were made during conversations freely and voluntarily entered into by the two defendants with each other in their cells prior to arraignment while police were still investigating the robbery; but more significantly, their statements were not the result of any interrogation conducted by law enforcement officers or anyone acting on their behalf. It is for this reason that Escobedo, Dorado and Stewart are not here controlling.
 The Supreme Court in People v. Dorado (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], extending the rule of Escobedo, held that a confession could not properly be introduced into evidence if "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." The Supreme Court continued: "Nothing that we have said, of course, should be interpreted to restrict law *371 enforcement officers during the investigatory stage from securing information from one who is later accused of the crime or from obtaining answers to their questions. Indeed, any statements obtained without coercion, including, of course, the unsolicited, spontaneous confession, given in the absence of the requirements for the accusatory stage, may be admitted into evidence. ..."
 "Only when the investigatory stage has become an accusatory one, that is, when it has begun to focus on a particular suspect, the suspect has been taken into police custody, and the police have carried out a process of interrogations that lends itself to eliciting incriminating statements, does the doctrine of Escobedo apply and the confession given without the required warning or other clear evidence of waiver become inadmissible evidence. Moreover, an important consideration in determining whether the accusatory stage had thus been reached must be a careful concern that there be no interference with the legitimate police investigation of an unsolved crime." (Italics added; pp. 353-354.)
 Further distinction between the investigatory stage and the accusatory stage has been made in the recent case of People v. Stewart, 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. The accusatory stage is reached when two conditions have been met: (1) the investigation is focused on a particular suspect who has been arrested, and (2) the officers have undertaken a process of interrogations lending itself to eliciting incriminating statements. The court pointed out that "for the purposes of Escobedo" the accusatory or critical stage does not begin with the arrest alone. "Although in most cases the process of interrogations following an arrest will so lend itself, it does not necessarily do so." Beyond the point of arrest the police must have entered upon a process of interrogations that lends itself to eliciting incriminating statements before the proceedings can be said to have reached the accusatory critical stage. (P. 577.) The test for determining when this stage has been reached is an analysis of the "total situation which envelops the questioning" by a consideration of various factors, all pertaining to the "inquiry." (Italics added; p. 579.)
 [6] While the record reveals that defendants were in custody and the official investigation had begun to focus on them, there is a complete absence of any showing that "the authorities had carried out a process of interrogations that *372 lent itself to eliciting incriminating statements." (People v. Dorado, supra, pp. 338, 353.) The police were in no way involved in the conversations between the two defendants; no officer was present at the time and there was no police questioning of any kind in the cells; the damaging statements were made pursuant to no inquiry by the officers or anyone on their behalf; whatever was said by either defendant was entirely unsolicited; and no incriminating statement was made by either defendant when confronted by the officers. While it is true that Officer Turner talked to defendants "five minutes each" while at the Hollywood station and "a couple of minutes each" at the Los Angeles Police Building several days later just before they were transferred to their cells, this does not support a finding that the police carried out a "process of interrogations that lent itself to eliciting incriminating statements." The record does not show what the police officer said to defendants or what they said to him. The conversations may or may not have concerned their participation in the holdup; they may have constituted general questioning only; they could well have been such as to aid defendants in establishing their innocence. [7] But there is no showing here that the police in any manner subjected defendants to any kind of inquiry or interrogation. It was while they were alone in their cells voluntarily conversing with each other that defendants freely and voluntarily made the several admissions. Moreover, during the two hour conversation, which was general in nature, defendants referred to the Chevron holdup on only several occasions and then in what appears to be only a casual manner. We cannot hold, as urged by appellants, that under these conditions the placing of defendants in adjoining cells in which a microphone was hidden to record and monitor their conversations constitutes the "process of interrogations" discussed in Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; People v. Dorado (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; and People v. Stewart, 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. [8] It is clear from the opinions in these cases that in its use of the language, "process of interrogations," the court contemplated what is commonly understood by that phrase--an active course of questioning, inquiry or examination. (See People v. Stewart (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97]; Webster, Third New International Dictionary (1961), p. 1182.) Not only is such a "process of interrogations" absent, but the record fails to show that defendants' *373 incriminating statements were the result of police conduct of any kind; they were, in fact, the result of their own natural desire to discuss their trouble between themselves. See In re Schlette (1965) 232 Cal.App.2d 407, 412 [42 Cal.Rptr. 708], where "the immediate impetus for his [defendant's] confession was not police questioning but his telephone conversation with his mother."
 [9] During the latter part of defendants' conversation, around 11:30 a.m., Officer Turner had Madrid brought from his cell; he told him that they would soon be arraigned and asked him if they had anything to say about the Chevron Station robbery. Madrid said, "No." Then picking the figure $240 "out of the air," Officer Turner remarked, "It is our understanding you got two hundred forty dollars"; Madrid said, "I didn't rob anybody." Madrid was returned to his cell where he said to Ross, "They say we got two hundred forty dollars"; Ross replied, "No, we only got around one hundred dollars"; Madrid corrected him, "No, it was ninety or eighty or something like that." The officer's statement concerning the $240 was not a question directed to Madrid but at most, a remark or comment relating to his "understanding" --even though not based on fact. While it called for no response Madrid voluntarily denied that he robbed anyone. It was certainly not an interrogation; it did not pertain to the asking of questions, nor did it connote inquiry of any kind. While the remark may have given defendants something to discuss between themselves, it did not constitute the kind of "process of interrogations" contemplated in the above cited cases.
 In view of our holding we see no necessity for determining whether the admission in evidence of the foregoing statements might have been prejudicial and produced a miscarriage of justice which would make a different result probable on retrial. (People v. Watson, 46 Cal.2d 818, 836 [299 P.2d 243].) However, the record reflects more than ample evidence to support the judgment of conviction. The victim, an eyewitness, observed the defendants during the robbery and not only described them and their conduct in detail, but positively identified them at the trial, during the preliminary hearing and twice at the station; and defendants' possession subsequent to the robbery of Exhibit 2 (one of Daulton's $2.00 bills) and Exhibit 1 (a rifle similar to the one used in the robbery) are circumstances pointing to defendants' guilt.
 Having found defendants' detention to be lawful and this *374 not to be a situation in which their statements were inadmissible, did the officer's conduct in placing defendants in cells in which a hidden microphone had been installed by which their conversations were monitored to another room where Officer Turner listened and the same were recorded, constitute an unlawful search and seizure? Appellants' argument that it did, relies on Massiah v. United States, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; and Mapp v. Ohio, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933], and the dissenting opinions in Rogers v. Superior Court, 46 Cal.2d 3 [291 P.2d 929], and Olmstead v. United States, 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376]. [10a] However, the record reveals no physical trespass, no seizure and no invasion of privacy; we can only conclude, therefore, that the conduct of the police did not constitute an unlawful search and seizure.
 [11] So far, the federal rule has been and is that the Fourth Amendment of the United States Constitution, by its language, is not applicable to a case of this kind because it relates to the search of material things--"persons, houses, papers and effects only." (Olmstead v. United States (1928) 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376].) In the cited case the Supreme Court upheld the admission of evidence gathered by the interception of defendants' telephone messages by federal officers who tapped their lines in the streets without trespass upon their property. Refusing to declare this to be within the ambit of the Fourth Amendment as an unreasonable search and seizure, the court said: "There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendants." (P. 464.) It also held that the Fifth Amendment was not involved because no compulsion induced defendants to talk over their telephones; they acted voluntarily without knowledge of the interception. (P. 462.) In 1942, on the authority of Olmstead, supra, the United States Supreme Court in Goldman v. United States, 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322] upheld the use of a detectaphone as not in violation of the Fourth Amendment. Federal agents from an adjacent office by means of a detectaphone placed against the partition wall listened to defendants' discussion in their office.
 While it may have been contended that the use of a radio transmitter constituted a violation of the Fourth Amendment *375 in Massiah v. United States, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], the court having made other disposition of the case, specifically passed the issue. (P. 204.) Also, Escobedo v. Illinois, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], ordered a reversal on other grounds and the decision therein was not based on any issue relating to unlawful search and seizure. While the issue was involved in Mapp v. Ohio, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081], the factual situation therein reveals actual physical trespass and seizure, none of which is present in the case at bar.
 Today the federal rule in Olmstead v. United States, 227 U.S. 438, 471 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376], controls in California. See People v. Graff, 144 Cal.App.2d 199 [300 P.2d 837], in which the admission of evidence secured by applying sound amplifying equipment to a wall between one apartment occupied by the officers and another in which defendant was conducting bookmaking operations, was upheld. (Pp. 203-205.) In People v. Morgan, 197 Cal.App.2d 90 [16 Cal.Rptr. 838], the court properly admitted evidence obtained by an electronic recording of a conversation between defendant and his sister during her visit to him in the county jail, which was carried over the telephone system, a privately installed and maintained intercommunication system in the jail. "Defendant's first contention is that the electronic recording here conducted constituted an illegal search and seizure. This contention is without merit. In Olmstead v. United States, 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376], it was held that electronic eavesdropping conducted without physical trespass does not constitute an illegal search and seizure under the Fourth Amendment. This rule was reiterated in Goldman v. United States, 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322], and was followed in People v. Anderson, 145 Cal.App.2d 201 [302 P.2d 358], and People v. Graff, 144 Cal.App.2d 199 [300 P.2d 937]. People v. Cahan, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], holds that if wiretap or eavesdropping equipment is installed during an illegal entry or trespass, the Fourth Amendment has been violated and the evidence must be excluded. Here, there is nothing approaching a trespass." (Pp. 92-93.)
 In People v. Bodkin, 196 Cal.App.2d 412 [16 Cal.Rptr. 506], without defendant's knowledge a tape recording was made of his confession and admissions freely and voluntarily made by him to an officer. The court held there was no invasion of his rights. "Making a recording of defendant's confession *376 and admissions without his knowledge is no more an invasion of his rights than it would be to stand outside the window and listen. (People v. Cotta, 49 Cal. 166, 169; State v. Behringer, 19 Ariz. 502 [172 P. 660, 661]; People v. Van Eyk, 56 Cal.2d 471, 477 [15 Cal.Rptr. 150, 364 P.2d 326]), or to listen through a telephone extension (People v. Pustau, 39 Cal.App.2d 407, 414 [103 P.2d 224]; United States v. Guller (D.C.Pa.) 101 F.Supp. 176, 178), or listen through a detectaphone placed against the outside of an office wall, as in Goldman v. United States, 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322], People v. Graff, 144 Cal.App.2d 199, 202- 205 [300 P.2d 837], People v. Anderson, 145 Cal.App.2d 201, 205 [302 P.2d 358], or enter a suspect's place of business or elsewhere engaging him in an incriminating conversation and through a concealed microphone transmit it to another person outside who is equipped with a receiving set, as in On Lee v. United States, 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270]. To the same effect see, People v. Collins, 80 Cal.App.2d 526, 536 [182 P.2d 585]; People v. Pustau, supra, 39 Cal.App.2d 407, 414. In the following cases the use of a secret sound recording device was specifically upheld, viz.: People v. Sica, 112 Cal.App.2d 574, 586 [247 P.2d 72]; People v. Avas, 144 Cal.App.2d 91, 99 [300 P.2d 695]; People v. Goldberg, 152 Cal.App.2d 562, 573 [314 P.2d 151]; People v. Albert, 182 Cal.App.2d 729, 736 [6 Cal.Rptr. 473]." (Pp. 425- 426.)
 [10b, 12] A microphone was hidden in the cells in which defendants were confined and their conversations were monitored to a listening post in another room. Certainly Officer Turner's access to this listening post in the jail was neither a trespass nor unlawful (People v. Avas, 144 Cal.App.2d 91, 99 [300 P.2d 695], citing On Lee v. United States, 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270]); nor is there any violation of due process in placing defendants in cells in which such a device was concealed, for there is no right of privacy in a jail. "Except only insofar as concerns consultation with his attorney in a room designated for that purpose, a prisoner has no right of privacy in a jail. (People v. Morgan (1961) 197 Cal.App.2d 90, 93 [16 Cal.Rptr. 838], cert. den. 370 U.S. 965 [82 S.Ct. 1606, 8 L.Ed.2d 830].)" (People v. Lopez, 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16].) In People v. Morgan, 197 Cal.App.2d 90, 93 [16 Cal.Rptr. 838], the court further stated: "Defendant also contends that the recording of the conversation was an invasion of his privacy and therefore unlawful. We are unable to see any merit in this argument. A man detained in jail cannot reasonably expect to *377 enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment." (See also Lanza v. New York, 370 U.S. 139, 142-144 [82 S.Ct. 1218, 8 L.Ed.2d 384].)
 [13] The failure of the police to advise defendants that their conversation would be recorded and Officer Turner's comment to Madrid regarding the $240, do not constitute conduct amounting to deception reasonably likely to procure an untrue statement. In People v. Hughes, 203 Cal.App.2d 598 [21 Cal.Rptr. 668], a tape recording of defendant's conversation with his wife and daughter was obtained without his knowledge by a recording device installed in the wall of the sheriff's office, the court said at page 601: "The deception itself does not render the statements inadmissible for it was not a type reasonably likely to procure an untrue statement (People v. Atchley, 53 Cal.2d 160 [346 P.2d 764]; cf. People v. Morgan, 197 Cal.App.2d 90 [16 Cal.Rptr. 838])." A case similar to the within case on its facts is People v. Stadnick, 207 Cal.App.2d 767 [25 Cal.Rptr. 30, 99 A.L.R.2d 766]. There, following their arrest three defendants in a robbery prosecution had requested permission to be allowed to talk it over and see what kind of statement they wanted to make. The officer took them to a room electronically equipped to permit an officer in an adjoining room to hear the conversation which was also recorded. The court upheld the admission of the officer's testimony regarding this conversation. "It was early established in this state that 'The fact that a confession was procured by the employment of falsehood by a police officer, detective, or other person does not alone exclude it; nor does the employment of any artifice, deception or fraud exclude it, if the artifice or fraud employed was not calculated to procure an untrue statement. ...' " (P. 774.)
 [14] Finally, appellants' reliance on Malloy v. Hogan (1965) 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653], and Griffin v. California, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], is misplaced inasmuch as these cases pertain and the privilege extends only to testimonial compulsion. (People v. Lopez, 60 Cal.2d 223, 244 [32 Cal.Rptr. 424, 384 P.2d 16].)
 For the foregoing reasons the judgments are affirmed.
 Wood, P. J., and Fourt, J., concurred.